# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 21, 2005 Session

## STATE OF TENNESSEE v. LETONIO SWADER

### Direct Appeal from the Circuit Court for Rutherford County
No. F-54010    James K. Clayton, Jr., Judge

--------

### No. M2005-00185-CCA-R3-CD - Filed February 6, 2006

--------

A Rutherford County Circuit Court jury convicted the appellant, Letonio Swader, of first degree felony murder, second degree murder, attempted especially aggravated robbery, and possession of a deadly weapon during the commission of an offense.  The trial court merged the murder convictions and sentenced the appellant to life.  The trial court also sentenced the appellant to ten years for the attempted especially aggravated robbery conviction and two years for the possession of a weapon conviction.  The trial court ordered the appellant to serve the life and ten-year sentences concurrently and ordered that the two-year sentence be served consecutively to the other two sentences.  On appeal, the appellant claims (1) that the State committed reversible error by telling potential jurors during voir dire that the punishment for first degree murder in this case was life with the possibility of parole, (2) that the trial court erred by failing to suppress his statement to police, and (3) that the evidence is insufficient to support the convictions because there is no evidence to corroborate his statement to police that he intended to rob someone.  Upon review of the record and the parties' briefs, we conclude that the State's comments during voir dire were improper but harmless error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Gerald L. Melton and Russell N. Perkins, Murfreesboro, Tennessee, for the appellant, Letonio Swader.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Trevor H. Lynch, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I.  Factual Background

On February 2, 2003, the victim, Kristen Holzapfel, was shot in the back while standing outside an apartment complex in Murfreesboro.  A petition was filed in the Rutherford County Juvenile Court, charging the appellant with first degree felony murder, attempted especially aggravated robbery, and possession of a firearm during the commission of an offense.  The appellant was transferred to criminal court to be tried as an adult.  The Rutherford County Grand Jury then charged the appellant with first degree premeditated murder, first degree felony murder, attempted especially aggravated robbery, and possession of a firearm during the commission of an offense.

Wayne Lawson, the victim's boyfriend, testified at trial that he was a detective with the Murfreesboro Police Department and was divorced with two young children.  In February 2003, Lawson lived in the Gateway apartment complex, apartment number A-9.  He stated that on Sunday, February 2, 2003, he and the victim spent the day with his children.  That evening, the victim and Lawson's daughter made jewelry from a craft kit, and Lawson prepared dinner.  They finished eating about 5:30 p.m., and Lawson began bathing his children while the victim cleaned up in the living room.  At some point, the victim went into the bathroom and asked Lawson for his car keys so that she could get a vacuum cleaner out of his car.  Lawson gave the victim the keys, and the victim went outside.

Lawson testified that after he finished bathing his children, his daughter told him that she could not find the victim and that a police officer was outside.  Lawson looked out a window and saw the officer standing over the victim, who was lying on the ground next to Lawson's car.  Lawson went outside, and Officer April Samol told Lawson that she believed the victim had been shot.  Lawson saw a small hole in the victim's back and a large amount of blood around her head.  Lawson turned the victim over and saw that her eyes were open and that her pupils were fixed.  The victim was unresponsive, had no pulse, and was not breathing.  Lawson stated that he never heard a gunshot.

Isaac Putnam testified that in February 2003, he lived in the Gateway apartment complex, apartment number A-13.  On the evening of February 2, he and his wife heard a gunshot.  Putnam walked onto his patio and saw the victim lying on the sidewalk.  He also saw blood underneath the victim's body and ran back inside to telephone 911.  By the time he got off the telephone, Officer Samol had arrived.  On cross-examination, Putnam stated that after he heard the gunshot and went outside, he did not see anyone other than the victim.

Officer April Samol of the Murfreesboro Police Department testified that on February 2, 2003, she was dispatched to the Gateway apartment complex in response to a possible shooting.  When she arrived, Isaac Putnam flagged her down and told her that a woman was lying in the parking lot.  Officer Samol saw the victim lying face-down in a fetal position. Wayne Lawson came out of his apartment and asked what was going on, and Officer Samol got out of her patrol car and

told him that she thought the victim had been shot. Lawson began screaming and crying. The victim did not have a pulse and was not breathing. Lawson lifted the victim's shirt, and Officer Samol saw a gunshot wound in the victim's back. When other officers arrived, they found a nine millimeter shell casing in the parking lot. They also found a set of keys, a vacuum cleaner, and a vacuum cleaner bag.

Jennifer Lynn Blackwell testified that on February 2, 2003, she lived in the G building of the Gateway apartment complex. That evening, Blackwell was talking on her cellular telephone when an African-American male in his teens or early twenties walked up to her glass door. He asked Blackwell for a cigarette, and she gave him one. The male was standing about one and one-half feet away from Blackwell, and she saw him for about thirty seconds. She stated that she was ninety to ninety-five percent certain that the male was the appellant.

Special Agent Jason Wilkerson of the Tennessee Bureau of Investigation (TBI) testified that he investigated the case. A nine millimeter shell casing was recovered from the crime scene and was found about twenty feet from the sidewalk. Agent Wilkerson also attended the victim's autopsy and received vials of the victim's blood and urine and her clothes. At some point, the appellant became a suspect. On the night of February 7, 2003, Agent Wilkerson and Detective Major Jim Gage were sitting in Gage's unmarked police vehicle and were conducting surveillance on the appellant's home. The appellant came out of his house, walked over to the vehicle, and began talking with the officers. The appellant told the officers his name, and the officers told the appellant that they needed to speak with him about a crime that had taken place. The appellant got in the front passenger seat of the vehicle, Agent Wilkerson got in the back seat, and Detective Gage drove them to the police department. Agent Wilkerson testified that the appellant was not under arrest at that time.

Agent Wilkerson testified that when they arrived at the police department, he read the appellant Miranda warnings and had the appellant sign a waiver of rights form. The appellant gave a statement, and Agent Wilkerson wrote out the statement. After the interview, the appellant read, made corrections to, and signed the written statement, which was read to the jury. According to the written statement, the appellant borrowed a nine millimeter gun from Eric Sargent. On the day of the shooting, he was at an apartment complex in Murfreesboro and was near the G building. He walked toward the A building and saw a woman outside. The appellant walked up to the woman and pointed the gun at her. The woman, who was near the sidewalk, turned to run, and the appellant, who was standing in the parking lot, turned away from her. As the appellant turned, the gun "went off." The appellant did not know if the woman had been shot and ran away. According to the written statement, the appellant pointed the gun at the woman in order to get money from her and had "thought about robbing someone before [he] went over there and did it."

Agent Wilkerson testified that during the interview, he asked the appellant how the appellant got to the apartment complex and the appellant would not tell him. He stated that the appellant also would not say where the appellant went after the shooting. The appellant told Agent Wilkerson that after the shooting, he gave the gun back to its owner but would not tell him who owned the gun. Agent Wilkerson later learned that the gun belonged to Jimmy Douglas' uncle. Agent Wilkerson

3

said that the appellant told him the appellant was about seven feet away from the victim at the time of the shooting. Agent Wilkerson testified that the appellant's interview was videotaped, and the tape was played for the jury.

Detective Major James E. Gage of the Murfreesboro Police Department testified that because Wayne Lawson was a detective with the police department, the TBI handled the investigation. From Jennifer Blackwell's description, the police developed a composite sketch of a suspect. Blackwell had described the suspect as an African-American male; about five feet, nine inches tall; in his early twenties; and wearing a bulky, quilted jacket. Detective Gage stated that when he and Agent Wilkerson drove the appellant to the police department, the appellant was wearing a heavy, down-filled jacket. At the police department, the appellant told Detective Gage that he had talked with a woman at the apartment complex before the shooting. Detective Gage testified that according to Jennifer Blackwell, the male she saw on the night of the shooting had asked her for a cigarette between 6:00 and 6:05 p.m. Detective Gage stated that the 911 call reporting the shooting was received at the police department between 6:12 and 6:16 p.m.

Dr. Amy R. McMaster testified that she performed the victim's autopsy. The victim had a gunshot wound to the middle of her upper back and died from the gunshot. The bullet traveled straight, and Dr. McMaster concluded that the gun was not fired at an angle. The bullet severed the victim's spinal cord, and the victim would have been paralyzed and unable to walk. The bullet also severed the victim's aorta, and the victim would have bled to death quickly. After receiving the gunshot, the victim could have lived for a few minutes, but she would have been unable to speak. Dr. McMaster found no soot on the victim's skin or clothing, indicating that the wound was a "distant gunshot wound." On cross-examination, Dr. McMaster testified that if the gun had been seven feet away from the victim when fired, the resulting wound would have been classified as a distant gunshot wound.

Special Agent Don Carman of the TBI testified that he was a forensic scientist in the firearms identification unit. He received a nine millimeter pistol from Agent Wilkerson, a shell casing recovered from the crime scene, and a bullet recovered from the victim's body. Agent Carman test-fired bullets from the pistol and compared them to the bullet recovered from the victim. He concluded that the bullet recovered from the victim was fired from the gun. He also examined the spent shell casing recovered from the crime scene and concluded that it had been fired from the gun. Agent Carman stated that in order for the gun to have been fired, seven and three-quarter pounds of pressure had to be applied to the trigger. He examined the victim's clothing and found no gunpowder residue. On cross-examination, Agent Carman testified that if the gun had been fired from more than three or four feet away, the gun would not have left gunpowder residue on the victim.

The appellant, who was seventeen years old at the time of trial, testified that he had been sixteen at the time of the shooting and a full-time high school student. On the afternoon of February 2, 2003, he was at his cousin Robert Gooch's house and stayed there for two to five hours. At some point, the appellant telephoned Shurrell Hyde, a former girlfriend. He went to Hyde's house about

4

5:30 p.m. and stayed there for about thirty minutes. The appellant then went outside, smoked a marijuana cigarette, and started walking. He said that he walked to the Gateway apartment complex, saw a woman outside, and asked her for a cigarette. The woman gave him the cigarette, and the appellant continued walking. The appellant saw the victim and walked past her. He turned around, and the two of them looked at each other briefly. The appellant said that the victim turned to run, that he turned to run, that the gun fired, and that "everything went black."

The appellant testified that he ran back to Robert Gooch's house and that Gooch drove him home. He left the gun at Gooch's house and learned the next morning that the victim had been killed. A few days after the shooting, the appellant noticed Agent Wilkerson and Detective Gage outside, near a church. He walked up to them and told them his name. The officers drove the appellant to the police department, and the appellant told them about the shooting. He stated that he did not remember telling Agent Wilkerson that he had gone to the apartment complex intending to rob someone and that he did not go to the Gateway apartment complex intending to commit a robbery. He acknowledged signing the written statement but said that he did so because he wanted to see his mother and "get it over with." When asked if he could give a reason for his pointing the gun at the victim, the appellant stated that he could not.

On cross-examination, the appellant testified that he could read and write. He stated that he borrowed the gun from Eric Sargent, a schoolmate, on the Tuesday or Wednesday before the shooting and that he was carrying the gun for protection. The appellant said that he carried the gun in his waistband or his pocket and that he showed the weapon to several friends. He said that Sargent told him the gun was loaded but that he never checked the gun. On the evening of February 2, the appellant visited Shurrell Hyde, went outside and smoked marijuana, and started walking. He walked to the Gateway apartment complex, looking for someone who could give him a cigarette. He saw Jennifer Blackwell talking on her cellular telephone, and she gave him one. After receiving the cigarette, he continued walking but did not know where he was going. The appellant saw the victim and walked past her. He turned around and made eye contact with the victim. He pulled out his gun, the victim turned to run, the appellant turned to run, and the gun fired.

The appellant acknowledged that before the shooting, the victim had not been a threat to him. He stated that he did not know why he turned around to look at the victim and that he ran away after the shooting because he was scared. He denied "plotting" to rob someone and said that if he had known the victim had been shot, he would have tried to get help for her. The appellant said that he ran back to Robert Gooch's house and left the gun beside a tree but that he was not trying to hide the gun. He said that he learned the next morning that the victim had been killed, that he went to school, and that he was planning to turn himself in to the police. He denied shooting the victim because she could identify him and said that he "truly and deeply" did not know why he shot her.

Although the appellant was charged with first degree premeditated murder, the jury convicted him of the lesser included offense of second degree murder, a Class A felony. The jury also convicted him of first degree felony murder; attempted especially aggravated robbery, a Class B felony; and possession of a deadly weapon during the commission of an offense, a Class E felony.

5

The trial court merged the murder convictions and sentenced the appellant to life. The trial court also sentenced the appellant as a Range I, standard offender to ten years for the attempted especially aggravated robbery conviction and two years for the possession of a weapon conviction. The trial court ordered the appellant to serve the life and ten-year sentences concurrently and ordered that the two-year sentence be served consecutively to the other two.

## II. Analysis

### A. Prosecutor's Comments on Punishment

The appellant claims that the trial court erred by refusing to allow him to tell potential jurors that he would have to serve at least fifty-one years in confinement before becoming eligible for parole and, in the alternative, that the trial court erred by refusing to grant his request for a mistrial. He argues that either measure was necessary because the prosecutor improperly told potential jurors during voir dire that if the jury found the appellant guilty of first degree murder, his sentence would be life with the possibility of parole. The State argues that in light of the evidence, any error was harmless. We agree with the State that the prosecutor's statements were harmless error.

During jury voir dire, the district attorney told potential jurors that if they found the appellant guilty of first degree murder, the only punishment he could receive was life with the possibility of parole.[1] The prosecutor then stated,

> As you see the Defendant seated behind me, you can tell he's a young man. And I believe the proof will be that at the time that we allege this offense took place -- and we are alleging of course that this Defendant committed first degree murder -- that he was 16 years of age. Would that factor make it impossible or make you be unable to sit on this jury, deliberate, hopefully return a verdict, and if that verdict is guilty, sentence this Defendant to life in the penitentiary with the possibility of parole sometime in the future? Is there anybody that couldn't do that?

The defense did not make a contemporaneous objection to the prosecutor's statements. However, during a recess, the defense argued to the trial court that the prosecutor's statements had been improper and had put in the jurors' minds that the appellant "could get out one day to perhaps make them more comfortable with being able to pronounce that kind of sentence." The defense requested that it be allowed to tell the potential jurors that the appellant would have to serve fifty-one years in confinement before being eligible for parole. The trial court refused to allow the defense to tell the jurors about the range of punishment but stated that the defense could tell the jurors that the appellant may never be paroled. The defense requested a mistrial, which the trial court denied. When voir dire resumed, the defense advised the potential jurors that upon conviction, the appellant faced the

---

[1] Before trial, the State withdrew its notice of intent to seek a sentence of life without parole.

6

possibility of never being released on parole.

Tennessee Code Annotated section 40-35-201(b) provides that

> [i]n all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, § 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

This court has concluded that a prosecutor's commenting on the possible penalties a defendant might receive in a noncapital case was harmless error. See State v. David Wayne Smart, No. M2001-02881-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 418, at *52 (Nashville, May 13, 2003); see also State v. Charles Ray Allen, No. M1999-00818-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 878, at *23 (Nashville, Nov. 3, 2000) (trial court's telling potential jurors during voir dire and again during jury instructions that the State was not seeking life without the possibility of parole and that a guilty verdict would result in the defendant's receiving a life sentence was harmless error); State v. Edward Pinchon, No. M1999-00994-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 262, at *13 (Nashville, Mar. 17, 2000) (trial court's instructing the jury that the State was not seeking life without the possibility of parole and that a guilty verdict would result in the defendant's receiving a life sentence was harmless error). In order to demonstrate prejudice, the appellant must show that but for the prosecutor's error, "there is a reasonable probability the jury would have acquitted him of first degree murder and found him guilty of the lesser offense of second degree murder or guilty of no offense at all." Pinchon, No. M1999-00994-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 262, at *12; see also Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

Initially, we note that during the recess in which the defense requested a mistrial, the prosecutor quoted Tennessee Code Annotated section 40-35-201(b), demonstrating that he was well-aware of the statute prohibiting his telling potential jurors about the appellant's possible punishment. Despite the prohibition in section -201(b), the prosecutor argued at the motion for new trial hearing that he could mention the possible punishment to the jury because the case involved a capital crime, which is governed by the procedures contained in §§ 39-13-204 and 39-13-205. However, in the instant case, the State was not seeking the death penalty or life without the possibility of parole and, therefore, the exception to the prohibition in section -201(b) did not apply. An attorney general opinion has addressed this very issue. In the opinion, the attorney general concluded that if the State is not seeking the death penalty or life without the possibility of parole in a first degree murder case, then the trial court is to impose a sentence of life under § 39-13-208(c), and the case "is not 'governed by the procedures contained in §§ 39-13-204 and 39-13-205.'" Op. Tenn. Att'y Gen. No. 99-178 (Sept. 17, 1999) (quoting Tenn. Code Ann. § 40-35-201(b)). Under those circumstances, a life sentence is the only possible punishment, and "Tenn. Code Ann. § 40-35-201(b) precludes instructing the jury as to possible penalties for the crime charged." Id.; see Smart, No. M2001-

7

02881-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 418, at *51 (citing Op. Tenn. Att'y Gen. No. 99-178 and concluding in the defendant's first degree murder case that the prosecutor was precluded by the statute from commenting during voir dire about the possible penalties he might receive).

Nevertheless, we conclude that the prosecutor's statements were harmless error. Given the appellant's confession, the State's case against him was strong. Moreover, the appellant originally had been charged with first degree felony murder and first degree premeditated murder. The jury found him guilty of the former. However, it acquitted him of premeditated murder and found him guilty of the lesser included offense of second degree murder, indicating that the jury carefully considered the evidence and convicted the appellant based upon the State's case, not upon the prosecutor's statements during voir dire. Based upon the entire record, we conclude that appellant is not entitled to relief.

## B. Appellant's Statement

Next, the appellant claims that the trial court erred by failing to suppress his statement to Agent Wilkerson and Detective Gage. Specifically, he contends that his statement should have been suppressed because his mother was not present during his interview and because his statement was coerced by the officers, who refused to allow him to see his mother until he gave the statement. The State argues that the trial court properly refused to suppress the statement. We agree with the State.

Before jury voir dire, the defense made an oral motion for the trial court to suppress the appellant's statement to police. During an in-chambers hearing on the motion, no witnesses testified. However, the defense told the trial court the following: After Agent Wilkerson and Detective Gage brought the appellant to the police department, they read the appellant his rights and had him sign a waiver of rights form. The appellant told the officers that he did not want to say anything until he spoke with his mother. One of the officers gave the appellant a cellular telephone, and the appellant telephoned his mother and asked her to come to the police department. One of the officers then left the interview room, and the remaining officer told the appellant that his mother was on the way and that "you don't really want to put her through this, do you? Why don't you just go on and tell us what happened, tell us the truth." The appellant then began talking to the officer about the crimes. At some point, the second officer returned to the interview room. While the appellant was giving his statement, one of the officers received a call, reporting that the appellant's mother had arrived. The officer left the room, and the remaining officer had the appellant read and sign his written statement. Before signing the statement, the appellant asked the officer, "Where is my mom?" The officer told the appellant, "[W]ell, she's here in the building." The appellant then signed the statement.

The defense argued that his statement to the police was coerced because the officers made him give the statement before they would allow him to see his mother. The State argued that the appellant's mother did not have to be present in order for the appellant to give the statement. The State noted that the officer wrote out the statement for the appellant, went over the statement with him, had him make corrections, and had him sign the statement. After giving the statement, the

appellant was allowed to see his mother. The trial court noted that although the appellant was sixteen years old at the time of the crimes, he had "been around." The court ruled that the officers had not intimidated the appellant or coerced him and held that although it would have been preferable for the appellant's mother to have been present, her presence was not required during the interview. The trial court overruled the appellant's motion to suppress.

Generally, the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). However, if an accused is informed of his Miranda rights and knowingly and voluntarily waives those rights, he may waive the privilege against self-incrimination. Id. (citing Miranda v. Arizona, 384 U.S. 436, 444-45, 478-79, 86 S. Ct. 1602, 1612, 1630 (1966)). Additionally, the trial judge's findings of fact at the motion to suppress hearing are accorded the weight of a jury verdict. See State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981). Accordingly, the trial court's decision is binding upon this court if the decision is supported by a preponderance of the evidence. See State v. Odom, 928 S.W.2d 18, 22-23 (Tenn. 1996).

In Callahan, 979 S.W.2d at 583, our supreme court stated that juvenile waivers must be analyzed under a totality-of-the-circumstances test that requires consideration of the following factors:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;
>
> (4) any intoxication;
>
> (5) any mental disease, disorder, or retardation; and
>
> (6) the presence of a parent, guardian, or interested adult.

The supreme court further stated that "[w]hile courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." Id. "[T]he admissibility of a juvenile's confession is not dependent upon the presence of his parents at the interrogation." State v. Carroll, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999).

9

Initially, we note that the videotape of the appellant's interview is in the record before us. However, the tape was redacted for trial, and the parts of the tape showing the appellant's initial request that his mother be present, that he received <u>Miranda</u> warnings, and that he signed a waiver of rights form are not included in the videotape.[2]  Nevertheless, the appellant does not contest the fact that he received <u>Miranda</u> warnings or that he signed the waiver of rights form.  Instead, he alleges that his statement was the result of police coercion.

The videotape reveals that before the interview, Detective Gage asked the appellant if he wanted anything, and the appellant laughingly said that he wanted a cigarette.  Agent Wilkerson told the appellant that they could not give him one, and the appellant asked for a Coke.  Detective Gage left the interview room, and Agent Wilkerson began talking to the appellant about the shooting. Shortly thereafter, Detective Gage returned to the room with the appellant's soft drink, and the officers continued to talk with the appellant about the case.  During the interview, Detective Gage was advised over his police radio that the appellant's mother had arrived.  Detective Gage told the appellant that he was going to bring her to the interview room "in just a little bit" and asked Agent Wilkerson how much longer he needed to interview the appellant.  Agent Wilkerson said, "Five or ten minutes," and Detective Gage left the room.  Agent Wilkerson and the appellant continued to talk about the shooting, with Agent Wilkerson writing the appellant's statement.  At the end of the interview, Agent Wilkerson had the appellant read the first line of the statement aloud.  The appellant then read the rest of the statement to himself.  After reading the statement, the appellant said, "I thought my momma was supposed to be here."  Agent Wilkerson told the appellant that she was downstairs and had the appellant sign the statement.

The videotaped interview demonstrates that the appellant possessed at least normal intelligence and was able to read and write in the language used to give the <u>Miranda</u> warnings.  The appellant had the capacity to understand the <u>Miranda</u> warnings and the consequences of the waiver. Although the appellant was only sixteen years old at the time of the interview, the record before us shows that he had familiarity with the juvenile court system, having been adjudicated delinquent of many offenses, including possession of marijuana, disorderly conduct, driving without a license, violating curfew, and assault.   The fact that he thought his mother was supposed to be present is another indication of his familiarity with the court system.  He was not under the influence of any alcohol or drugs at the time of the interview and did not appear to be suffering from any mental disorders.  We note that while talking with Agent Wilkerson and Detective Gage, the appellant was calm and cooperative.  Although the appellant's mother was not present during the interview, we conclude that the trial court properly denied the appellant's motion to suppress.

## C.  Sufficiency of the Evidence

Finally, the appellant claims that the evidence is insufficient to support the convictions

_____

[2]Before the State played the redacted videotape for the jury, both parties agreed that they would introduce the unredacted videotape into evidence for identification purposes only.  However, the unredacted videotape was never made a part of the record.

10

because no evidence, other than his proximity to the victim, corroborates his statement that he intended to rob someone. The State claims that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In Tennessee, it is well-established that a conviction cannot be founded solely upon a defendant's confession. State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000) (citing Ashby v. State, 139 S.W. 872, 875 (Tenn. 1911)). Some corroborating evidence is required which, independently of the confession, tends to establish the corpus delicti of the offense charged. Id. However, where there is a confession, the corroborative evidence "need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession." Ricketts v. State, 241 S.W.2d 604, 606 (Tenn. 1951). The corroborating evidence is sufficient to sustain a conviction if "it tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration." Id.; see also Smith, 24 S.W.3d at 281. "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone." Taylor v. State, 479 S.W.2d 659, 661-62 (Tenn. Crim. App. 1972).

In the present case, the appellant's confession was corroborated by numerous means. First, the appellant told Agent Wilkerson that on the night of the shooting, he was in an apartment complex and near the G building. Jennifer Blackwell testified that she lived in the G building and that about 6:00 p.m., she gave a cigarette to a young African-American male. Blackwell was ninety to ninety-five percent certain that the male was the appellant. Second, the appellant told Agent Wilkerson that he walked to the A building. Wayne Lawson testified that he lived in apartment number A-9 and that the victim was shot in front of his apartment. Third, the appellant told the police that at the time of the shooting, he was standing in the parking lot and that the victim was standing near the sidewalk. Lawson testified that when he first saw the victim, she was lying partially on the sidewalk, and the evidence established that a shell casing was found in the parking lot. Fourth, the appellant stated that he was about seven feet from the victim at the time of the shooting, and Don Carman testified that no soot was found on the victim's clothing, indicating that she was shot from a distance of more than three or four feet away. Fifth, the appellant stated that the gun was a nine millimeter

pistol, and Officer April Samol testified that the shell casing recovered from the crime scene was a nine millimeter. Finally, the appellant told Agent Wilkerson that he shot the victim as the victim turned away from him, and the evidence shows that the victim was shot in the back. We conclude that the appellant's confession was sufficiently corroborated by the testimony of other witnesses and, therefore, that the evidence is sufficient to sustain the jury's finding that the appellant intended to rob the victim.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE